1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

10  JOHN R. MARTINEZ,                           Case No.  1:10-cv-01501-SKO (PC)

11          Plaintiff,                          ORDER GRANTING PLAINTIFF'S
                                                REQUEST FOR JUDICIAL NOTICE OF
12     v.                                       POLICY, GRANTING DEFENDANTS'
                                                MOTION FOR SUMMARY JUDGMENT,
13  JAMES TILTON, et al.,                       AND DIRECTING CLERK OF COURT TO
                                                ENTER JUDGMENT
14          Defendants.
                                                (Docs. 63 and 71)
15

16  _____/

17  **I.      <u>Background</u>**

18          Plaintiff John R. Martinez ("Plaintiff"), proceeding pro se, filed this civil rights action

19  pursuant to 42 U.S.C. § 1983 on August 19, 2010.  (Doc. 1.)  Plaintiff is now represented with

20  counsel, 28 U.S.C. § 1915(e)(1), and the parties consented to Magistrate Judge jurisdiction, 28

21  U.S.C. § 636.  (Docs. 5, 18, 23.)  This action currently proceed on Plaintiff's amended complaint

22  against Defendants Adams and Jennings ("Defendants") for violating Plaintiff's rights under the

23  First and Eighth Amendments of the United States Constitution in March and April 2008.  (Docs.

24  14, 44, 57.)

25          The events at issue occurred while Plaintiff was incarcerated at California State Prison-

26  Corcoran ("COR") in the Security Housing Unit ("SHU").  Plaintiff's First Amendment retaliation

27  claim arises out of his placement in the "EOP Hub," which houses mentally ill inmates, and his

28  Eighth Amendment claim arises out of noisy conditions to which he was subjected while in the

1   EOP Hub.[1]   At the time of the events at issue, Defendant Adams was the warden of COR and

2   Defendant Jennings was a captain.

3       On May 1, 2014, Defendants filed a motion for summary judgment.  Fed. R. Civ. P. 56.

4   Plaintiff filed an opposition on June 11, 2014; Defendants filed a reply on June 20, 2014; and the

5   motion was submitted upon the record without oral argument.[2]  Local Rule 230(g).

6   **II.    Summary Judgment Standard**

7       Any party may move for summary judgment, and the Court shall grant summary judgment

8   if the movant shows that there is no genuine dispute as to any material fact and the movant is

9   entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a) (quotation marks omitted);

10  *Washington Mut. Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether

11  it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of

12  materials in the record, including but not limited to depositions, documents, declarations, or

13  discovery; or (2) showing that the materials cited do not establish the presence or absence of a

14  genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.

15  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the

16  record not cited to by the parties, although it is not required to do so.  Fed. R. Civ. P. 56(c)(3);

17  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord*

18  *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

19      Defendants do not bear the burden of proof at trial and in moving for summary judgment,

20  they need only prove an absence of evidence to support Plaintiff's case.  *In re Oracle Corp. Sec.*

21  *Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

22  S.Ct. 2548 (1986)).  If Defendants meet their initial burden, the burden then shifts to Plaintiff "to

23  designate specific facts demonstrating the existence of genuine issues for trial."  *In re Oracle*

24  *Corp.*, 627 F.3d at 387 (citing *Celotex Corp.*, 477 U.S. at 323).  This requires Plaintiff to "show

25

26

27  [1] EOP is the abbreviation for Enhanced Outpatient Program, which is a prison mental health care program designation. Cal Code Regs., tit. 15, § 3040.1(d); *Coleman v. Brown*, 28 F.Supp.3d 1068, 1075 (E.D.Cal. 2014).

28  [2] The parties received extensions of time.

1    more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby,*

2    *Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

3        However, in judging the evidence at the summary judgment stage, the Court may not make

4    credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless, Inc.*, 509

5    F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all

6    inferences in the light most favorable to the nonmoving party and determine whether a genuine

7    issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v.*

8    *City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

9    The Court determines only whether there is a genuine issue for trial. *Thomas v. Ponder*, 611 F.3d

10   1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

11   **III.**   **Discussion**

12        **A.**   **Parties' Statements of Fact**[3,4]

13            **1.**   **Defendants Adams and Jennings**

14        Plaintiff, a prisoner in the custody of the California Department of Corrections and

15   Rehabilitation ("CDCR"), was incarcerated at COR from February 2002 to January 2011.  For the

16   majority of his incarceration at COR, Plaintiff was housed in the SHU because he was a validated

17   gang associate of the Mexican Mafia.  Before March 2008, Plaintiff was housed in Building

18   4B3R, which was known as the "Validated Gang Unit" because it predominately housed SHU

---

19   [3] It is not the practice of the Court to rule on evidentiary matters individually in the context of summary judgment,
20   unless otherwise noted; and therefore, the Court declines to address each objection, many of which were not
     evidentiary objections but arguments regarding interpretation of the evidence.  *See Capital Records, LLC v. BlueBeat,*
21   *Inc.*, 765 F.Supp.2d 1198, 1200 n.1 (C.D.Cal. 2010).  With respect to objections in general, the Court notes that "[a]t
     summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial."
22   *Nevada Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (citing *Block v. City of Los Angeles*, 253 F.3d
     410, 418-19 (9th Cir. 2001)) (internal quotations omitted).  The focus is on the admissibility of the evidence's
23   contents, not its form.  *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004); *Fraser v.*
     *Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Cheeks v. General Dynamics*, 22 F.Supp.3d 1015, 1027 (D.Ariz.
24   2014); *Burch v. Regents of Univ. of California*, 433 F.Supp.2d 1110, 1122 (E.D.Cal. 2006).  The Court also notes that
     "the requirement of personal knowledge imposes only a minimal burden on a witness; if reasonable persons could
25   differ as to whether the witness had an adequate opportunity to observe, the witness's testimony is admissible."
     *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1045 (9th Cir. 2013) (internal quotations and citation omitted).
26   Although allegations based purely on belief do not suffice, the personal knowledge threshold is particularly low at
     summary judgment because all justifiable inferences must be drawn in favor of the nonmoving party.  *Id.* (quotations
27   and citations omitted).  Thus, "[u]nfounded speculation as to an affiant's alleged lack of personal knowledge of the
     events in his affidavit does not render it inadmissible."  *Greene*, 648 F.3d at 1019.

28   [4] Some facts which the Court determined to be irrelevant and/or immaterial, such as Plaintiff's educational level, were
     omitted.

inmates who had been found to be active prison gang members or associates. Because of the types of inmates housed in the SHU, inmate movement and out-of-cell activities were limited and very restricted. This included inmates being subjected to unclothed body searches when they went to or returned from the exercise modules, where SHU inmates had outdoor yard time.

On August 1, 2007, Defendant Adams issued a directive requiring that all SHU inmates undergo an unclothed body search before they were removed from the exercise modules. Before August 1, 2007, the unclothed body search was conducted in the rotunda area (hallway) of the housing unit. The change in the location of the unclothed body search was necessary to control and prevent the movement of contraband within the SHU and to protect the institution, staff, and inmates.

On March 15 and 16, 2008, sixty-seven inmates, including Plaintiff, were extracted from the exercise modules on Facility 4B because they refused to submit to the required unclothed body search.[5] The SHU inmates refused to undergo the required search to protest the August 2007 change to the search policy.

Prior to the protest of March 15, 2008, Defendant Adams was not aware that Plaintiff had filed an inmate appeal or grievance ("602") complaining about the change to the SHU unclothed body search policy, and Plaintiff had not complained directly to Adams about the policy change.

When Plaintiff was taken out of his cell for yard on March 15, 2008, he had already decided that he was not going to comply with the required unclothed body search at the end of the yard session.

The mass exercise module extractions resulted in a major disruption to the operations of the entire prison. Officers and medical staff from other yards were redirected to Facility 4B to assist with the extractions, resulting in an interruption or complete stoppage of certain services on other yards, such as mail collection and distribution. Most of the staff involved in the extractions were on duty for almost twenty continuous hours; and the prison's pepper-spray supply was virtually depleted, requiring that staff obtain needed pepper spray from another nearby prison.

---

[5] The incident began in the afternoon of March 15, 2008, and extended into the early morning hours of March 16, 2008. (Doc. 77, Martinez Depo., 88:6-16 & 95:24-96:24.)

1  The effects of the mass extractions continued for weeks because of the reporting requirements,

2  investigations, and disciplinary actions that ensued.

3     As part of the review and investigation process, Defendant Adams was informed that

4  Plaintiff had been identified as a possible instigator or inciter of the protest or unlawful refusal to

5  submit to the required unclothed body search, which resulted in the mass extractions.  On March

6  20, 2008, Defendant Adams ordered Facility 4B staff to temporarily move Plaintiff to Building

7  4B1L pending an investigation into his possible involvement in the protest.  The temporary move

8  was necessary to segregate Plaintiff from his associates or sympathizers and to prevent any further

9  unlawful activities or the exchange of information between Plaintiff and any possible co-

10  conspirator.

11     Building 4B1L was an administrative segregation unit ("ASU") and primarily housed

12  inmates being held in short-term segregation pending their transfer to a mental-health program at

13  the EOP or Psychiatric Services Unit ("PSU") level.  Building 4B1L was also used to temporarily

14  house SHU inmates who had pending disciplinary actions, investigations, or other concerns that

15  warranted or required their segregation.  Other than the presence of mental health staff, Building

16  4B1L was staffed and supervised like any other SHU or ASU building at COR.  Defendant

17  Adams's decision, and Defendant Jennings's order, to temporarily move Plaintiff to Building

18  4B1L was completely independent of any 602 or other complaint he had filed concerning the SHU

19  unclothed body searches, and Defendants would have temporarily moved him regardless of any

20  protected activity in which Plaintiff engaged.

21     As a validated gang associate of the Mexican Mafia, Plaintiff was required to be housed in

22  the SHU or ASU.  Defendant Adams did not order Plaintiff to be moved to Facility 4A, which was

23  the other COR SHU Facility, because Defendant Adams feared Plaintiff would continue his illegal

24  activities, organize or encourage the inmates on Facility 4A to protest the unclothed body search

25  policy, and engage in the same unlawful activities as those he was suspected of organizing or

26  participating in on Facility 4B on March 15 and 16, 2008.  Thus, housing Plaintiff on Facility 4A

27  would have put the institution, yard, staff, or inmates at risk.  Defendant Adams did not order that

28  Plaintiff be moved to Building 2 or 4 on Facility 4B because those units housed other validated

Mexican Mafia members or associates, and Plaintiff could have continued his unlawful activities from Buildings 2 and 4. Thus, the only housing unit on Facility 4B that was a viable option for Plaintiff's temporary segregation was Building 4B1L.

In the course of their work, Defendants had been inside of Building 4B1L and observed its operations. To Defendants' knowledge, EOP inmates in temporary segregation, such as those in Building 4B1L, were not any more disruptive, noisy, or violent than other segregated inmates. Defendants did not know, and they were never informed by staff working in Building 4B1L, that the housing unit was noisier or more disruptive than other ASU or SHU buildings or that more incidents occurred in 4B1L than other housing units. During the time Plaintiff was temporarily housed in Building 4B1L, he did not complain to Defendants, and they did not know, that he was unable to sleep or that he suffered any adverse effect from being housed in Building 4B1L.

Plaintiff was temporarily housed in Building 4B1L until April 21, 2008. At that time, no evidence was found that he was an inciter or instigator of the protest that led to the mass extractions on March 15 and 16, 2008, and he was returned to Building 4B3R. Plaintiff's temporary move to Building 4B1L served a legitimate correctional purpose; it allowed prison staff to investigate his role in the unlawful activities that led to the mass extractions and prevented any further disruption to the prison's operations. Defendants would have taken the same action and issued the same orders regardless of any 602 or other complaint Plaintiff filed concerning the SHU unclothed body search policy, and Plaintiff has no evidence to the contrary.

## 2.    **Plaintiff's Position**[6]

Plaintiff was validated as an associate of the Mexican Mafia prison gang in 2004, and while at COR, he was housed in the SHU or ASU because of that affiliation. Between February

---

[6] Plaintiff's request for judicial notice of CDCR's Mental Health Services Delivery System Mental Health Program Guide, Chapter 4, Enhanced Outpatient Program is granted, and Defendants' evidentiary objection for lack of foundation is overruled. (Doc. 71, Request for Jud. Not.; Doc. 92, Reply, 8:24-27.) There is no indication the document is not what is purports to be, which is CDCR's official EOP policy guideline. The Court has not been called upon by Plaintiff to apply any sort of interpretation that requires expert testimony, Fed. R. Evid. 702, and the documents speaks for itself in terms of its use by Plaintiff as evidence (general characterization of program, critical components, program objectives, and treatment criteria). Moreover, for the purpose of resolving Defendants' motion for summary judgment, the Court need only accept as a fact that the EOP is a level "of mental health care for seriously mentally ill inmates who, due to their mental illness, are unable to function in the general prison population." *Coleman*, 28 F.Supp.3d at 1075.

2008 and April 2008, Plaintiff's only recalled mental health needs involved symptoms of depression, for which he was prescribed Zoloft and designated as a Correctional Clinical Case Management Services (CCCMS) patient; at no time during 2008 was Plaintiff designated as an Enhanced Outpatient Program ("EOP") inmate.[7]

On or about March 2008, Plaintiff was known to be close to Arturo Guzman, who was the leader or "shot-caller" of the Mexican Mafia prison gang, in part because COR custody staff placed them in close proximity to each other.  No documents included in the Active/Inactive Gang Review dated April 9, 2008, refer to Plaintiff as being a *member* of the Mexican Mafia or evidence any influence he held over and/or among its membership.  Those documents were either created or compiled by the COR Institutional Gang Investigations staff and submitted to the CDCR Special Service Unit Gang Validation/Rejection Review.

On or about April 16, 2008, Plaintiff was convicted of a serious rules violation (CDC 115) for willfully delaying a peace officer in connection with his conduct during the March 15, 2008, mass inmate refusal to submit to unclothed body searches, a refusal that resulted in his forcible removal from an exercise module by custody staff.

In 2008, COR was a complex, multi-mission institution that housed inmates with various custody levels.  Its facilities accommodated custody levels 1, 3, and 4; administrative segregation; protective custody; and an acute care hospital.

On or about August 1, 2007, Defendant Adams issued a memorandum modifying the unclothed body search policy applicable to SHU inmates returning from the SHU exercise modules.  The relevant change in policy was moving the location of the searches from inside the rotunda building to outdoors, before the inmates exited the SHU exercise modules.  With the exception of a lone lieutenant, typically during the hours of 2200 through 0600 there is not a custody staff member higher than the rank of lieutenant.

The physical layout of COR in March 2008 is depicted in the included aerial photograph. (Pl. Ex. 3.)  The bottom portion of the aerial photograph depicts the security or protective housing

---

[7] The CCCMS level of mental health care provides services to "mentally ill inmates with stable functioning in the general population, Administrative Segregation Unit (ASU), or Security Housing Unit (SHU) whose mental health symptoms are under control or in partial remission as a result of treatment."  *Coleman*, 28 F.Supp.3d at 1074.

units (SHU or PHU) near the perimeter and a stand-alone administrative segregation unit (ASU) near the center-right.

On March 20, 2008, the stand-alone ASU could house 200 inmates. Administrative segregation is a designated housing unit designed to house inmates that have violated some CDCR policy or institutional rule. Administrative segregation units did not house inmates that required mental health care at the EOP level. The difference between an ASU cell and a SHU cell is only semantic; as such, segregating a SHU inmate could be accomplished by placing the inmate in an ASU cell, or by simply leaving the SHU inmate in his current cell.

The COR SHU/PHU has two facilities, 4A and 4B. Each facility is comprised of four buildings (4A1 through 4A4 and 4B1 through 4B4). Each building has a left and right section (4A1L, 4A1R, etc.). Each section, with the exception of 4A1L, is capable of housing up to 128 inmates in 64 cells designed for double-occupancy. On March 20, 2008, the COR SHU could accommodate at least 2037 inmates. On or about March 2008, COR Facility 4A housed inmates who had dropped-out of their prison gang and/or disruptive group and were completing the debriefing process; this is also known as a sensitive needs yard (SNY). Facility 4A also housed "mainline" regular SHU inmates and inmates assigned to protective housing units (PHU). Facility 4A4R had a "C" section consisting of protective housing units that housed inmates of notoriety, such as Charles Manson. COR Facility 4B1L was a SHU that housed EOP inmates exclusively, some of whom may have been validated gang members. COR Facility 4B1R handled any overflow of EOP inmates from Facility 4B1L, but was mainly used as a "mainline" regular SHU. COR Facility 4B2L and 4B2R housed "mainline" or regular SHU inmates, but also may have housed validated gang members temporarily. Facility 4B3L was a regular SHU with overflow capacity for validated gang members; and 4B3R, 4B4R, and 4B4L housed validated gang members; however, validated gang members were also housed in 4B1L. Validated gang members are not segregated by gang affiliation. Of the inmates housed in COR Facility 4B3 and 4B4, some were deemed shot-callers because of their influence over other inmates of the same gang affiliation.

From February 2008 through April 2008, Defendant Jennings was the COR Facility 4B Captain.  This position entailed overall control and supervision of COR Facility 4B and any custody staff that were assigned to the same.  Typically, Defendant Jennings' position required him to be on site from 8:00 a.m. to 4:30 p.m., but he stayed beyond 4:30 p.m. if his position required additional hours.  Defendant Jennings does not typically see, review, or investigate inmate appeals.

From February 2008 through April 2008, Defendant Adams was the Warden of COR. This position entailed overall supervision and responsibility for COR.  Defendant Adams had two chief deputy wardens, six associate wardens, and six facility captains under him.  Defendant Adams was not likely to be involved in the reviewing or investigating inmate appeals.

From February 2008 through March 2008, Plaintiff was subjected to cross-gender strip searches on three separate occasions; and as a result of Defendant Adams' August 1, 2007, memorandum modifying the unclothed body search policy applicable to SHU inmates returning from their exercise modules, a large portion of the affected inmate population complained.  The occurrence of cross-gender unclothed body searches in a non-emergency situation would be a violation of CDCR policy and federal law.

On or about February 28, 2008, Plaintiff filed an inmate appeal (CDC 602) which was assigned log number 08-01263 and documented his complaints about cross-gender unclothed body searches.  On or about March 3, 2008, in response to Plaintiff's inmate appeal, an unknown COR custody staff member justified the occurrence of the cross-gender unclothed body searches based on written instructions from Defendant Adams.  The appeal response also supports, at least in part, the validity of Plaintiff's claim that such searches were occurring by trying to argue in favor of the searches' routineness and by stating that the matter was being "researched."

On or about March 12, 2008, Defendant Jennings met with inmates housed in COR Facility 4B to informally address their shared complaints regarding the unclothed body searches being conducted before the inmates were returned to their SHU cells.  A list of those who attended included: Plaintiff, Arturo Guzman, James Mickey, and an inmate known only as "Hashima." James Mickey was the known shot-caller for the Aryan Brotherhood prison gang, Arturo Guzman

was the shot-caller for the Mexican Mafia prison gang, and "Hashima" was the shot-caller for the African-American inmates.   Inmates Guzman, Mickey, and Hashima also represented their associated racial groups.  After Plaintiff vocalized shared inmate complaints about the modified unclothed body searches taking place outside and in the presence of COR female staff, Defendant Jennings prohibited his future participation in such meetings.[8]   Defendant Jennings does not specifically recall the March 12, 2008, meeting, but he does not deny having numerous meeting with inmates, which were used as opportunities to air and/or address inmate living and/or housing issues.

Plaintiff sent no fewer than two letters to COR custody staff, including Defendants Jennings and Adams, regarding his ongoing complaints; and after the mass inmate refusal to submit to unclothed body searches on March 15, 2008, Defendant Adams had a privacy screen installed to alleviate inmate concerns about female staff being able to view inmates during the searches.

On March 15, 2008, at approximately 2250 hours, seventy-five inmates assigned to the SHU at COR Facility 4B refused to submit to unclothed body searches while in the SHU exercise modules.  Of these inmates, sixty-five required forcible removal through use of chemical agents, and one inmate required the use of physical force.  Those portions of the report that describe Plaintiff's involvement in this incident do not mention his capacity or authority to lead the incident or deviate in any appreciable way from the other inmate entries.

Lt. Hubach described custody staff information that indicated Plaintiff was an inciter or instigator of the mass inmate refusal to submit to unclothed body searches on March 15, 2008, as "some speculation."   On or about March 15, 2008, Lt. Hubach created the CDC-837 Crime/Incident Report that pertained to the mass inmate refusal to submit to unclothed body searches on March 15, 2008.  The report was based on all facts and information known at the time it was drafted, and it does not contain any information about Plaintiff being an inciter and/or instigator of the incident.  Other than the information included in the CDC-837 Crime/Incident

---

[8] Omitted is Plaintiff's assertion that he was ejected from the meeting because that fact is not supported by the evidence Plaintiff cited, as discussed in greater detail in footnote 13.

1  Report by Lt. Hubach dated March 15, 2008, Defendant Jennings is not aware of any further
2  information about Plaintiff's involvement in the March 15, 2008, mass inmate refusal to submit to
3  unclothed body searches.

4  Defendant Adams made the decision to house Plaintiff in COR Facility 4B1L, which was
5  the EOP Hub; and on or about March 20, 2008, Defendant Jennings authored a CDC-128-B
6  General Chrono – Informational/Gang Activity/Single Cell Status, which stated that Plaintiff was
7  being moved from 4B3R-25L to 4B1L-46L so as to place him on single-cell status and prevent
8  him from continuing to incite other inmates.  The evidence that Defendant Jennings cited as cause
9  for their belief that Plaintiff acted as an inciter was the fact that he refused to submit to an
10  unclothed body search while in the exercise yard modules and his status as an associate of the
11  Mexican Mafia prison gang.

12  On March 20, 2008, the COR Daily Movement Sheet indicated there were available beds
13  in COR ASU and Facilities 4A1L, 4A1R, 4A2L, 4A2R, 4A3L, 4A3R, 4A4L, 4A4R (A&B
14  section), 4A4R (C section, 4), 4B1R, 4B2L, 4B2R, 4B3L, 4B3R, 4B4L, and 4B4R.   Every
15  occupied bed in 4B1L was filled by an EOP inmate on March 20, 2008.

16  Inmates who receive enhanced outpatient program care are designated EOP by CDCR
17  Mental Health Services because they are receiving mental health care services.   EOP is
18  characterized by a separate housing unit and structured activities for mentally ill inmate-patients
19  who, because of their illness, experience adjustment difficulties in a General Population ("GP")
20  setting, yet are not so impaired as to require 24-hour inpatient care.   One of the critical
21  components of the program is the designated housing unit with restricted access and alternative
22  educational, work, and recreational opportunities specifically provided for inmate-patients whose
23  mental illness precludes their placement and participation in the GP programs.  One of the specific
24  objectives of EOP is to provide treatment that focuses on achieving behavioral control and the
25  development of socially acceptable behavior within the institution.   Specific EOP treatment
26  criteria require those receiving services to experience: (1) acute onset of or significant
27  decompensation of a serious mental disorder characterized by symptoms such as delusional
28  thinking, marked changes in affect, and vegetative signs with definitive impairment of reality

testing and/or judgment; (2) an inability to function in the GP; and (3) usually, a Global Assessment Functioning score of less than fifty.

EOP inmates are known to be louder (i.e., increased screaming and yelling) than other inmates.  While Plaintiff was housed in Facility 4B1L, cell 46L, the other inmates housed next to or near him yelled loudly, banged objects on their in-cell sinks, and in general were extremely disruptive, particularly at night.

Defendant Jennings is not qualified to answer whether EOP inmates are any louder that other inmates.

There are a number of reasons why EOP inmates are segregated from the rest of the prison population: (1) they require and/or receive additional mental health services in a group setting, or (2) they could be victimized by other inmates.  In other words, EOP inmates are segregated so as to provide increased clinical and custodial support and limit contact with members of the institution's GP inmate population.  Under normal circumstances, non-EOP inmates are not housed with EOP inmates.

In dealing with an incident of the magnitude of the mass inmate refusal to submit to unclothed body searches on March 15, 2008, COR Institutional Gang Investigators (IGI) and/or the Investigative Services Unit (ISU) conduct an investigation by interviewing confidential informants and unit staff.  If any information about the inmate under investigation is discovered, it would come from the IGI and/or the ISU.

In general, when an inmate is removed from his present housing and segregated pending investigation into an alleged violation of a CDCR policy or rule, a CDC 114-D is used to document the event.  The document is used to convey to the inmate important information pertaining to the reasons justifying his change in housing.  The document is typically provided to the inmate immediately, but must be provided within no more than forty-eight hours.

If the IGI or ISU had any information on Plaintiff being an inciter of the mass inmate refusal to submit to unclothed body searches on March 15, 2008, that information would have also been used and/or relied upon by CDCR staff in connection with a gang validation review.

SHU inmates who are being investigated for a serious rules violation can remain in their current cell.  On or about March 21, 2008, Lt. Hubach wrote a Serious Rules Violation Report (log number 4B-08-03-027).   The report stated that Plaintiff violated prison policy by willfully delaying a peace officer in connection with his conduct during the mass inmate refusal to submit to unclothed body searches on March 15, 2008.

On or about April 10, 2008, Lt. Hubach authored a CDC-128-B – Loss of Yard Status that removed Plaintiff's yard privileges pending the adjudication of his serious rules violation (log number 4B-08-03-027), in a stated effort to prevent the reoccurrence of his refusal to strip-out before being removed from the Facility 4B exercise modules.

On three occasions while Plaintiff was housed in 4B1L (the EOP Hub), he received treatment from a COR mental health staff member as a result of increased stress caused by his move to 4B1L.

Plaintiff claims that Defendant Adams' decision to move him from 4B3R to 4B1L was retaliatory because of the availability of other housing options.

On or about March 25, 2008, Plaintiff filed an inmate appeal, log number 08-2079, along with a supporting statement.  Plaintiff's appeal specifically complained about being moved to COR Facility 4B1L in retaliation for refusing to submit to an unclothed body search while in view of others on March 15, 2008.  The appeal also complained about the absence of any evidence supporting the purported claim by custody staff that Plaintiff was an inciter of the mass inmate refusal to submit to an unclothed body search on March 15, 2008.

On or about April 2008, Plaintiff spoke to Lt. Hubach while he was housed in 4B1L regarding Plaintiff's inmate appeals (log numbers 08-2079 and 08-1661).[9]  During Lt. Hubach's interview of Plaintiff, Lt. Hubach informed Plaintiff that he would not be allowed to move out of the EOP unit or back to a regular unit absent Defendant Jennings' approval.

On or about April 2008, Plaintiff was interviewed by COR IGI Officer Espinoza in connection with an inactive gang status review.  Plaintiff states that he was told by IGI Espinoza

---

[9] Appeal log number 08-1661 was filed on March 19, 2008.  (Doc. 92-2, Reply, Ex. G.)

that IGI staff (including the IGI counselor and IGI case manager) were confused as to why Plaintiff was being housed in the EOP unit.[10]

## B.   First Amendment Retaliation Claim – Placement in EOP Hub

### 1.   Legal Standard

Under section 1983, Plaintiff must link Defendants Adams and Jennings to the participation in the violation at issue. *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77, 129 S.Ct. 1937, 1948-49 (2009); *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1020-21 (9th Cir. 2010); *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Some causal connection must exist between the actions or omissions of Defendants and the alleged violation; liability may not be imposed under a theory of *respondeat superior*. *Iqbal*, 556 U.S. at 676-77; *Lemire v. California Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1074-75 (9th Cir. 2013); *Lacey v. Maricopa County*, 693 F.3d 896, 915-16 (9th Cir. 2012) (en banc); *Starr v. Baca*, 652 F.3d 1202, 1205-08 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2101 (2012).

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *accord Watison*, 668 F.3d at 1114-15; *Brodheim*, 584 F.3d at 1269.

### 2.   Adverse Action

First, Defendants argue that moving Plaintiff to 4B1L (the EOP Hub) was not an adverse action because he does not have a right to be housed in any specific prison or unit, and because

---

[10] Defendants object to this statement as hearsay. It does *not* appear the statement qualifies as an opposing party statement under any of the bases identified in Fed. R. Evid. 801(d)(2)(A)-(E), but at this stage, the focus is on the admissibility of the evidence's contents rather than its form and Espinoza could testify as to his confusion regarding Plaintiff's placement in the EOP Hub. *Fonseca*, 374 F.3d at 846.

complaints about the deprivation of sleep and mental tranquility are properly analyzed under the Eighth Amendment and do not give rise to a separate First Amendment retaliation claim.  These arguments are not persuasive, however.

While inmates do not have the constitutional right to be housed at a particular prison or within a particular unit at a prison, the lack of a separate constitutionally protected interest in a particular housing assignment does not defeat a retaliation claim.  *Watison*, 668 F.3d at 1114; *Austin v. Terhune*, 367 F.3d 1167, 1170-71 (9th Cir. 2004); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995); *Hines v. Gomez*, 108 F.3d 265, 268 (9th Cir. 1997).  "The adverse action need not be an independent constitutional violation," *Watison*, 668 F.3d at 1114 (citing *Pratt*, 65 F.3d at 806), and the issue is whether the transfer from 4B3R (Validated Gang Unit) to 4B1L (the EOP Hub) constituted adverse action.

It is well established that even the mere threat of harm can be sufficiently adverse to support a retaliation claim, *id.* (citing *Brodheim*, 584 F.3d at 1270), and in this case, there is no dispute that the EOP Hub primarily housed mentally ill inmates pending their transfer to higher levels of mental health care.  Further, at the time of Plaintiff's transfer, all beds in the EOP Hub were filled with EOP inmates and Plaintiff was not an EOP inmate.  Defendant Adams attested that "under normal circumstances," prison officials prefer not to use the EOP Hub for non-EOP inmates, and Plaintiff has produced evidence that there was an increased level of noise in the EOP Hub, particularly at night.  (Doc. 78, Adams Depo., 44:19-20.)  This evidence more than suffices to preclude Defendants from entitlement to summary judgment on adverse action element.[11] *Watison*, 668 F.3d at 1115-16; *Brodheim*, 584 F.3d at 1269-70.

### 3.    Engagement in Protected Conduct

Next, Defendants appear to argue that Plaintiff was moved pending an investigation into his involvement in the inmate protest and prisoners who violate legitimate prison regulations are not engaged in protected conduct.  However, prisoners have a protected right to seek redress for

---

[11] Defendants do not advance an argument that they are entitled to judgment on the chilling element and therefore, it is not addressed.  The Court notes, however, that the test is whether a person of ordinary firmness would have been chilled in the exercise of his rights and harm that is more than minimal will almost always have a chilling effect. *Brodheim*, 584 F.3d at 1269-70 (citation and quotation marks omitted).

1   prison grievances, and that is the protected conduct at issue. *Watson*, 668 F.3d at 1114;

2   *Brodheim*, 584 F.3d at 1269; *Rhodes*, 408 F.3d at 567. There is no dispute that Plaintiff filed

3   grievances (602s) regarding the August 2007 unclothed body search policy, and he produced

4   evidence that he complained verbally to Defendant Jennings about the policy in a meeting on

5   March 12, 2008. This is sufficient to demonstrate Plaintiff's engagement in protected conduct,

6   and Defendants are not entitled to judgment on that element.

7              **4.    Retaliatory Motive**

8                    **a.    Standard**

9        Plaintiff must also show that his pursuit of his written and/or verbal complaints about the

10  unclothed body search policy were the substantial or motivating factor behind his placement in the

11  EOP Hub. *Brodheim*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citing *Soranno's Gasco, Inc. v.*

12  *Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)). In this Circuit, Plaintiff need "only put forth

13  evidence of retaliatory motive that, taken in the light most favorable to him, presents a genuine

14  issue of material fact as to" Defendants' motivation. *Brodheim*, 584 F.3d at 1271 (citing *Bruce v.*

15  *Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)) (internal quotation marks omitted). This requires

16  Plaintiff to offer either direct evidence of retaliatory motive or at least one of three general types

17  of circumstantial evidence: (1) proximity in time between the protected conduct and the alleged

18  retaliation, (2) expressed opposition to the conduct, or (3) other evidence that the reasons proffered

19  by Defendants for the adverse action were false and pretextual. *McCollum v. California*

20  *Department of Corrections and Rehabilitation*, 647 F.3d 870, 882 (9th Cir. 2011) (citing *Allen v.*

21  *Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002)) (quotation marks omitted). Direct evidence of

22  improper motive is only rarely available, and this case presents no exception. *Watson*, 668 F.3d

23  at 1114; *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir.

24  1999).

25              **b.    Plaintiff's Complaints**

26       Plaintiff alleges that Defendants moved him to the EOP Hub in retaliation against him for

27  complaining about the August 2007 strip search policy. Plaintiff filed an inmate appeal on

28  February 28, 2008, regarding his opposition to the "degrading" strip searches taking place outside,

and a second inmate appeal on March 19, 2008, regarding the use of force against him on March 16, 2008, as well as the unclothed body searches.[12]  (Doc. 92, Reply, Ex. F, G.)  However, there is no dispute that Plaintiff's two appeals were addressed by staff other than Defendants Adams and Jennings, and there is no evidence that Defendants Adams and Jennings were involved in addressing the appeals or were aware of the appeals.  Indeed, Plaintiff concedes that Defendant Jennings did not typically see, review, or investigate inmate appeals; and that Defendant Adams was not likely to be involved in reviewing or investigating inmate appeals.

Plaintiff also attested in his deposition that he wrote Defendant Jennings two letters prior to the March 12, 2008, meeting but he received no responses; and that he wrote Defendant Adams a letter.  (Doc. 77, Martinez Depo., 19:24-20:16 & 60:1-61:3.)  There is no evidence these letters were received by or responded to by Defendants, however.

Finally, on March 12, 2008, Plaintiff, along with three other inmates who were shot-callers for prison gangs, met with Defendant Jennings to address inmates' complaints about the unclothed body search policy.  It was the first such meeting Plaintiff ever attended, and he was the most vocal of the inmates, addressing all the points of contention.  (Martinez Depo., 70:1-3 & 71:14-17.)  Plaintiff interrupted Defendant Jennings a couple of times, which "kind of pissed [him] off." (*Id.*, 71:9-10.)  Defendant Jennings asked, "Who brought this guy out here?" and gave some indication Plaintiff would not be back at the next meeting.[13]  (*Id.*, 71:11-13.)

### c.     Mass Inmate Protest of Search Policy on March 15, 2008

On March 15, 2008, seventy-five SHU inmates on COR Facility B refused to submit to the required unclothed body searches when their exercise module yard time ended.  Sixty-seven inmates, including Plaintiff, had to be extracted from the exercise modules, resulting in massive institutional disruption, including diversion of staff from other areas; disruption of other services

---

[12] As previously set forth, the mass inmate protest began on March 15, 2008, and ended on March 16, 2008.  The use of pepper spray against Plaintiff occurred in the early morning hours of March 16, 2008.

[13] Plaintiff contended that Defendant Jennings had him ejected from the meeting, but the evidence cited for this proposition does not show that Plaintiff was removed from the meeting.  (Doc. 69, Pl. Fact Stmt., #38, citing Martinez Depo., 71:9-13.)  To the contrary, it appears that while Plaintiff may not have been welcomed back to any future meetings, he remained for the duration of that meeting.  (Martinez Depo., 71-12-13 7 73:22-74:8; *see also* Doc. 1, Comp., ¶24; Doc. 13, Amend. Comp., ¶8.)

on other yards, including mail collection and distribution; near depletion of the institution's pepper spray supply, which necessitated the need to obtain more from a nearby prison; and the need for most of the involved staff to work almost twenty hours straight.  Over the ensuing weeks, reports, investigations, and disciplinary actions continued.

### d.    Move to EOP Hub

On March 20, 2008, Defendant Adams ordered staff to temporarily move Plaintiff from Building 3 on Facility 4B to 4B1L (the EOP Hub).  (Doc. 63-3, Motion, Adams Dec., ¶13.) Defendant Adams attested he was informed that Plaintiff had been identified as a possible instigator or inciter of the protest, and he ordered the bed move to segregate Plaintiff from associates or sympathizers while investigating his possible involvement.  (*Id.*)  Plaintiff had to be housed in the SHU or ASU because he was a validated gang associate of the Mexican Mafia, and Defendant Adams attested that he could not move Plaintiff to the other SHU Facility, 4A, because of concern Plaintiff would continue his illegal activities; organize or encourage protests of the search policy; and engage in the same activities he had engaged in on Facility 4B.  (*Id.*, ¶15.) Defendant Adams attested that he could not move Plaintiff to Building 2 or Building 4 on Facility 4B because they housed other validated Mexican Mafia members or associates, and Plaintiff could have continued his illegal activities there, which left Building 4B1L as the only viable option to temporarily segregate Plaintiff.  (*Id.*)

On March 20, 2008, Defendant Jennings signed the General Chrono (CDC 128-B) documenting Plaintiff's move to 4B1L (the EOP Hub).  The chrono stated, in relevant part:

> Prior to this incident (the March 15-16, 2008, mass protest) Inmate Martinez J-52893, 4B3R-25L was identified by staff as being a possible inciter to this incident. Specifically, Inmate Martinez refused to submit to an unclothed body search in the exercise yard modules.  Martinez is a validated Mexican Mafia (EME) associate with influence.  In an effort to prevent Inmate Martinez from continuing to incite others and jeopardize the safety and security of the prison, he is being placed on single-cell status and is being re-housed into 4B1L-46L pending [i]nvestigation into this matter.

(Doc. 63-5, Def. Ex. A.)

///

///

e.      **Findings**

The Court finds that there is a lack of sufficient evidence to raise a triable issue of fact regarding the existence of a retaliatory motive on the part of Defendant Adams or Defendant Jennings.   *McCollum*, 647 F.3d at 882-83; *Pratt*, 65 F.3d at 808.   Defendant Adams was responsible for making the decision to move Plaintiff to the EOP Hub on March 20, 2008, while his involvement in the mass protest was investigated, and there is no evidence Defendant Adams knew who Plaintiff was or had any ill feelings toward him.   Plaintiff attested that he sent Defendant Adams a letter complaining about the unclothed body search policy, but assuming the truth of that allegation, Plaintiff's description of the event in his deposition is conclusory at best and the letter was sent prior to the mass protest, undercutting the argument that the timing of the letter and the move to the EOP Hub was suspect.   *See McCollum*, 647 F.3d at 882-83; *Pratt*, 65 F.3d at 808.  (Martinez Depo., 59:8-61:9; Reply, Ex. F.)

Further, there is insufficient evidence that the proffered reason for the housing move was false or pretextual.  Plaintiff is a Mexican Mafia associate, he was known by prison officials to associate with the shot-caller for the Mexican Mafia, and he was involved in the mass protest of the unclothed body searches.   Although Plaintiff was subsequently released from the EOP Hub once the investigation was concluded, his release does not negate prison officials' need to first separate him and then further investigate.   Moreover, although Plaintiff contends other housing units were available, Defendant Adams explained why Facility A and Buildings 2, 3, and 4 on Facility B were not suitable under the circumstances.   Plaintiff's complaints about the unclothed body searches must have been the substantial or motivating factor behind Defendant Adams' decision to move him to the EOP Hub and here, the evidence Plaintiff produced regarding retaliatory motive does not suffice to raise a triable issue of fact.[14]

With respect to Defendant Jennings, Plaintiff attested that he sent Jennings several letters and that Jennings was irritated or angry with him during the meeting on March 12, 2008.

---

[14] Regarding IGI Officer Espinosa's statement, Defendant Adams attested that under normal circumstances, a non-EOP inmate would not be housed with EOP inmates and he set forth his reasons for the deviation that occurred on March 20, 2008.  Espinosa's statement indicates that the situation was out of the ordinary but Defendant Adams concedes as much and the statement does not suffice to create a triable issue of fact regarding Defendant Adams' motive.

1    However, Plaintiff attested that it was his first time at such a meeting, he did most of the talking,

2    and he interrupted Defendant Jennings several times.   The fact that Defendant Jennings was

3    annoyed with Plaintiff and made it clear he would not be attending any further meetings does not

4    suffice to raise a triable issue of fact regarding retaliatory motive given the context in which

5    Defendant Jennings was irritated; the absence of any evidence that Defendant Jennings was aware

6    of and irritated with Plaintiff for his written complaints; and the fact that the intervening event

7    between this meeting and Plaintiff's move to the EOP Hub was a mass inmate protest on March

8    15, 2008, which caused significant institutional disruption.   Moreover, it was not Defendant

9    Jennings who made the decision to move Plaintiff to the EOP Hub; it was Defendant Adams.   In

10   short, there is no evidence that Defendants Jennings was responsible for moving Plaintiff to the

11   EOP Hub or that he possessed any animus toward Plaintiff for writing letters and filing appeals,

12   and there is very little evidence to support Plaintiff's contention that Defendant Jennings was

13   angry with him *because of* his engagement in protected verbal conduct during the March 12, 2008,

14   meeting.

15          "Mere speculation that defendants acted out of retaliation is not sufficient."   *Wood v.*

16   *Yordy*, 753 F.3d 899, 905 (9th Cir. 2014).   Accordingly, Defendants Adams and Jennings are

17   entitled to judgment on Plaintiff's retaliation claim given the absence of sufficient evidence to

18   create a triable issue of fact as to the motivation underlying the move to the EOP Hub.[15,16]

19   ///

20   ///

21   ///

22

23   [15] Plaintiff cites to *Riley v. Roach*, 572 Fed.Appx. 504 (9th Cir. 2014) in support of his argument that he has produced sufficient evidence to defeat Defendants' motion on the causation.   (Doc. 68, Opp., 21-22.)   *Riley v. Roach* is unpublished, but in any event, it involved evidence that the defendant officer told the plaintiff he was not going to be released from his cell for his work assignment because the defendant did not like paper pushers who filed against the defendant's buddies.   *Id.* at 506.   This case involves no such statements evidencing retaliatory intent.   At best, Plaintiff has evidence that he complained about the unclothed body search policy and that he was moved after he complained. However, the circumstantial evidence of timing is weak given the mass protest which preceded Plaintiff's move to the EOP Hub.   *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000); *Pratt*, 65 F.3d at 808.

24

25

26

27   [16] The Court also acknowledges Plaintiff's argument that he was not issued a CDC 115 or a CDC 114-D, which he suggests was an irregularity supporting the existence of improper motive.   However, Plaintiff was issued a CDC 115 on March 21, 2008, and he was found guilty of the charge on April 16, 2008, undercutting the argument that the absence of either a CDC 115 or a CDC 114-D supports an inference of improper motive.   (Doc. 73, Pl. Ex. 1, p. 11.)

28

1          **5.      Legitimate Correctional Purpose**

2          Finally, although Plaintiff's retaliation claim fails on the causation element, the Court will

3   address the legitimate penological purpose element, as Defendants are entitled to judgment on that

4   ground as well.

5          Plaintiff must demonstrate "that there were no legitimate correctional purposes motivating

6   the actions he complains of," *Pratt*, 65 F.3d at 808, and the Court must "'afford appropriate

7   deference and flexibility' to prison officials in the evaluation of proffered legitimate penological

8   reasons for conduct alleged to be retaliatory," *id.* at 807 (quoting *Sandin v. Conner*, 515 U.S. 472,

9   482, 115 S.Ct. 2293 (1995)).  In evaluating the existence of a legitimate correctional goal, there

10  must be a valid, rational connection between the rule, regulation, or action and the legitimate,

11  neutral governmental interest put forward to just it.  *Brodheim*, 584 F.3d at 1272-73 (citing *Shaw*

12  *v. Murphy*, 532 U.S. 223, 228, 121 S.Ct. 1475 (2001)) (quotation marks omitted).  In addition,

13  courts should consider (1) the existence of alternate means of exercising the right available to

14  inmates; (2) the impact accommodation of the asserted constitutional right will have on guards and

15  other inmates, and on the allocation of prison resources generally; and (3) the absence of ready

16  alternatives available to the prison for achieving the governmental objectives.  *Id.* (citing *Shaw*,

17  532 U.S. at 228) (quotation marks omitted).

18         In this case, the evidence demonstrates a valid, rational connection between the housing

19  move and the need to ensure that institutional safety and security was secure following the mass

20  protest of March 15, and 16, 2008.  The protest that began on March 15, 2008, involved a large

21  number of SHU inmates and it extended from the afternoon of March 15 into the morning hours of

22  March 16, 2008.  Prison officials first needed to regain control of the yard and then to thoroughly

23  investigate the incident, determine who was involved, and make decisions regarding discipline.

24  The protest was not a minor incident and it caused a significant disruption to the prison.

25         Furthermore, there is no dispute that Plaintiff was involved in the protest; that he was a

26  validated associate of the Mexican Mafia housed in the SHU; and that prison officials knew him

27  be "was very close in proximity and in dealing with the Mexican Mafia leader of that yard, Artie

28  Guzman."  (Doc. 80, Hubach Depo., 28:14-29:2 & 30:1-31:1.)  In addition, prison officials had

1   some information that Plaintiff was advising Mr. Guzman.  (*Id.*)  While Plaintiff contends that he

2   was in close physical proximity to Mr. Guzman by virtue of prison officials' housing assignment

3   decisions, this negates neither the potential existence of a close, influential relationship between

4   the two nor prison officials' suspicion of an influential gang related relationship between the two

5   men.  Plaintiff also argues that Defendants did not have any evidence he was responsible for

6   instigating the March 15, 2008, protest, but prison officials necessarily have the discretion to (1)

7   investigate threats to institutional safety and security, which includes consideration of all

8   information available to them, and (2) take security action they deem necessary while they

9   conduct their investigation.  Any suggestion that prison officials are restrained from taking

10  preventative security measures until they are certain of a fact would render effective prison

11  management impossible and would jeopardize institutional, staff, and inmate safety.

12       In as much as prison officials had some information regarding Plaintiff's ties to the

13  Mexican Mafia shot caller on the yard, there existed some concern among staff regarding these

14  ties.  Plaintiff was also involved in the protest.  Thus, the decision to move Plaintiff to a housing

15  unit where he would not be able to influence other inmates while they investigated the mass

16  protest and his involvement was rationally related to the specific threat to institutional safety and

17  security that resulted from the March 15, 2008, protest.  In response to Plaintiff's argument that

18  there is no evidence linking him to the mass protest, Defendants produced a document refuting

19  this and evidencing some connection between Plaintiff and the protest on March 15, 2008.

20  (Reply, Ex. H.)  Moreover, Defendant Adams explained that of the options on Facility B (four

21  buildings, two sections in each), Plaintiff needed to be removed from Building 3 and Buildings 2

22  and 4 housed other validated Mexican Mafia associates or members who might have been

23  influenced by Plaintiff, which left Building 1 on Facility B.[17]

24       In conclusion, prison officials are entitled to deference as to their stated reason for the

25  housing move.  Considering all of the relevant factors, the Court finds Plaintiff has not submitted

26

27

28  [17] 4B1L was the EOP Hub and 4B1R handled EOP overflow but was mainly used as a "mainline" regular SHU.  (Doc. 69, Pl. Fact 21.)

1 sufficient evidence to raise a triable issue of fact regarding the absence of a legitimate penological

2 purpose behind his temporary transfer to the EOP Hub.

3          **C.      Eighth Amendment Claim – Noisy Conditions of EOP Hub**

4                  **1.      Legal Standard**

5          The Eighth Amendment's prohibition against cruel and unusual punishment protects

6 prisoners not only from inhumane methods of punishment but also from inhumane conditions of

7 confinement.  *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing *Farmer v.*

8 *Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994) and *Rhodes v. Chapman*, 452 U.S. 337, 347,

9 101 S.Ct. 2392 (1981)) (quotation marks omitted).  While conditions of confinement may be, and

10 often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of

11 pain.  *Morgan*, 465 F.3d at 1045 (citing *Rhodes*, 452 U.S. at 347) (quotation marks omitted).

12 Thus, conditions which are devoid of legitimate penological purpose or contrary to evolving

13 standards of decency that mark the progress of a maturing society violate the Eighth Amendment.

14 *Morgan*, 465 F.3d at 1045 (quotation marks and citations omitted); *Hope v. Pelzer*, 536 U.S. 730,

15 737, 122 S.Ct. 2508 (2002); *Rhodes*, 452 U.S. at 346.

16          Prison officials have a duty to ensure that prisoners are provided adequate shelter, food,

17 clothing, sanitation, medical care, and personal safety, *Johnson v. Lewis*, 217 F.3d 726, 731 (9th

18 Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains

19 while in prison represents a constitutional violation, *Morgan*, 465 F.3d at 1045 (quotation marks

20 omitted).  To maintain an Eighth Amendment claim, a prisoner must show that prison officials

21 were deliberately indifferent to a substantial risk of harm to his health or safety.  *E.g., Farmer*, 511

22 U.S. at 847; *Thomas v. Ponder*, 611 F.3d 1144, 1150-51 (9th Cir. 2010); *Foster v. Runnels*, 554

23 F.3d 807, 812-14 (9th Cir. 2009); *Morgan*, 465 F.3d at 1045; *Johnson*, 217 F.3d at 731; *Frost v.*

24 *Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).

25                  **2.      Objective Element – Substantial Risk of Harm From Noise**

26          The EOP Hub houses mentally ill inmates, and there is evidence that EOP inmates are

27 generally known to be louder than other inmates: they yelled loudly, banged objects on their in-

28 cell sinks, and were in general extremely disruptive, particularly at night.  The Ninth Circuit has

1   recognized that inmates have a right to be housed in an environment reasonably free of excessive

2   noise, *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), and Defendants do not argue that the

3   noisy conditions described fail to raise a triable issue of fact as to the objective element of an

4   Eighth Amendment claim.  Defendants confine their argument to the absence of evidence on the

5   subjective element of deliberate indifference, and therefore, the Court assumes without deciding

6   that there is a triable issue of fact regarding whether the noise level was excessive and constituted

7   an objectively serious risk of harm to Plaintiff.  *Keenan*, 83 F.3d at 1091.

8              **3.    Subjective Element – Deliberate Indifference Toward Risk of Harm**

9         Deliberate indifference is a two-part inquiry which requires a showing that prison officials

10  were aware of the risk to the inmate's health or safety and that they deliberately disregarded that

11  risk.  *Foster*, 554 F.3d at 814 (citing *Johnson*, 217 F.3d at 734).  "First, the inmate must show that

12  the prison officials were aware of a 'substantial risk of serious harm' to an inmate's health or

13  safety."  *Thomas*, 611 F.3d at 1150 (quoting *Farmer*, 511 U.S. at 837).  "'A factfinder may

14  conclude that a prison official knew of a substantial risk from the very fact that the risk is

15  obvious,'" *Foster*, 554 F.3d at 814 (quoting *Farmer*, 511 U.S. at 842), and "'if an inmate presents

16  evidence of very obvious and blatant circumstances indicating that the prison official knew a

17  substantial risk of serious harm existed, then it is proper to infer that the official must have known

18  of the risk,'" *Thomas*, 611 F.3d at 1152 (quoting *Foster*, 554 F.3d at 814).  "Second, the inmate

19  must show that the prison officials had no 'reasonable' justification for the deprivation, in spite of

20  that risk."  *Id.* at 1150-51 (quoting *Farmer*, 511 U.S. at 844).

21        Here, there is no evidence raising a triable issue of fact as to Defendants' knowledge that

22  the noise level in the EOP Unit was high enough to pose a substantial risk of serious harm to

23  Plaintiff's health.  Plaintiff concedes that it was noisiest at night, when Defendants were off-duty,

24  and that ordinarily, there would be no occasion for Plaintiff to see Defendants given his segregated

25  housing.  Although Plaintiff argues that "[i]n effect, Defendants kept themselves blissfully

26  ignorant of [his] complaints," there is simply no evidence that they turned a blind eye to the

27  condition complained of or that the EOP Hub was so noisy that the risk of harm was obvious,

28  supporting an inference that they knew.  *Thomas*, 611 F.3d at 1152.  (Doc. 68, Opp., 20:10.)

While Plaintiff complained about the noise to lower level staff, which prompted a cell move, section 1983 does not permit Plaintiff to impose liability on Defendants for an unconstitutional condition of which they were not aware. *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013); *Lemire*, 726 F.3d at 1074-75; *Lacey*, 693 F.3d at 915-16.  (Doc. 77, Martinez Depo., 125:19-126:3.)  Accordingly, in the absence of evidence that Defendants Adams and Jennings knew of and disregarded the excessively noisy conditions in the EOP Hub, they are entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim.

## IV.    <u>Conclusion and Order</u>

The Court finds that there is insufficient evidence to raise a triable issue of fact as to an improper motive underlying Plaintiff's temporary transfer to the EOP Hub or a triable issue of fact as to the absence of a legitimate penological purpose underlying the transfer.   Therefore, Defendants are entitled to judgment on Plaintiff's First Amendment retaliation claim.  Defendants are also entitled to judgment on Plaintiff's Eighth Amendment claim because there is no evidence raising a triable of issue of fact regarding their deliberate indifference toward excessive noise, assuming the noisy conditions of the EOP Hub suffice as to the objective element.  In light of these findings, the Court does not reach Defendants' qualified immunity argument, and Defendants' request for an *Albino* hearing on the issue administrative exhaustion, which was contingent upon denial of their motion for summary judgment, is moot.[18]  *Albino v. Baca*, 747 F.3d 1162, 1170-71 (9th Cir. 2014) (en banc), *cert. denied*, 135 S.Ct. 403 (2014).

Accordingly, it is HEREBY ORDERED that:

1.    Plaintiff's request for judicial notice of CDCR's Mental Health Services Delivery System Mental Health Program Guide, Chapter 4, Enhanced Outpatient Program, filed on June 11, 2014, is GRANTED (Doc. 71-1);

2.    Defendants Adams and Jennings' motion for summary judgment, filed on May 1, 2014, is GRANTED (Doc. 63); and

---

[18] Prior to the issuance of the *Albino* decision, Defendants' motion to dismiss for failure to exhaust was denied on October 16, 2013, on the ground that there was a disputed issue of fact regarding whether Plaintiff refused to be interviewed for his inmate appeal and resolution of that issue requires a credibility determination.  (Doc. 44, Order, 3:19-4:12.)  If Plaintiff refused to be interviewed, his appeal was properly cancelled and he failed to exhaust, but if he did not refuse to be interviewed, the cancellation was improper and he exhausted.  (*Id.*)

3.     The Clerk of the Court shall enter judgment in favor of Defendants.

IT IS SO ORDERED.

Dated:   **March 16, 2015**                              **/s/ Sheila K. Oberto**
                                           UNITED STATES MAGISTRATE JUDGE